**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O-Factor LLC, | No. CV-21-00453-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Precision Extraction Corporation, et al., | |
| Defendants. | |

Plaintiff O-Factor LLC ("O-Factor") is in the business of processing hemp oil. In December 2019, O-Factor entered into a contract with a non-party to rent a commercial distillation unit. Before receiving the distillation unit, O-Factor entered into a different contract with another non-party to process that party's hemp oil into a refined product. Unfortunately, the distillation unit was not delivered on time or in an operable state. As a result, O-Factor was unable to fulfill its processing obligations under the second contract, which allegedly caused O-Factor to sustain more than $1.5 million in economic damages.

O-Factor now seeks to recover its economic damages from two companies with whom it was not in contractual privity: (1) Defendant Mass2Media, LLC dba PX2 Holdings ("PX2"), the manufacturer of the distillation unit; and (2) Defendant Precision Extraction Corporation dba Precision Extraction Solutions ("Precision"), the distributor that supplied O-Factor's contractual partner with the distillation unit. Defendants have, in turn, moved for judgment on the pleadings. (Doc. 37.) For the following reasons, the motion is granted.

# BACKGROUND

I. Factual Background

O-Factor "is a licensed processor and handler for the Arizona Department of Agriculture Hemp Program . . . for industrial hemp." (Doc. 16-1 at 38.) In this capacity, O-Factor "processes industrial hemp and hemp oil and supplies hemp products derived therefrom." (*Id.*)

On December 11, 2019, O-Factor entered a contract with non-party Equipment Leasing Services ("ELS") to lease a commercial distillation unit and related items (together, the "Equipment"). (Doc. 16 ¶¶ 7, 13; Doc. 16-1 at 34, 36.) PX2 and Precision were not parties to this contract—instead, PHX simply manufactured the Equipment and Precision sold and distributed the Equipment to ELS. (Doc. 16 ¶ 34.)

ELS "promised that the Equipment would be shipped and received . . . before December 16, 2019." (*Id.* ¶ 8.) In reliance on this promise, O-Factor entered into a separate contract with non-party Kofarm, LLC ("Kofarm"). (*Id.* ¶ 13.) Under this contract, entitled "Hemp Processing Agreement," O-Factor agreed to take delivery of "crude hemp oil" from Kofarm and then process Kofarm's crude oil into "THC-Compliant Full Spectrum Distillate." (Doc. 16-1 at 38-40, 52.)

ELS did not deliver the Equipment to O-Factor until December 30, 2019, two weeks after the promised delivery date, and when the Equipment arrived it was "unassembled, damaged, broken, and inoperable." (Doc. 16 ¶¶ 16-17.) As a result, O-Factor could not meet its contractual obligations to Kofarm, which rescinded the Hemp Processing Agreement. (*Id.* ¶¶ 20-22.) This caused O-Factor to sustain a "loss of business and profits . . . totaling $1,526,936.40." (*Id.* ¶ 52.)

On the same day the Equipment was delivered, O-Factor "notified ELS about the condition of the Equipment and its breach in the contract," but ELS denied liability and stated that Precision was the manufacturer and the responsible party under the contract. (*Id.* ¶¶ 18-19.)

That same day, O-Factor asked Precision to fix the Equipment. (*Id.* ¶ 23.) Precision

denied that the Equipment should arrive assembled, refused to assemble the Equipment unless a fee was paid, and recommended a specific third party to fix the Equipment. (*Id.* ¶ 24.)

In January 2020, O-Factor hired the third party to assemble the Equipment, but the Equipment remained inoperable after the third party's assembly attempt. (*Id.* ¶¶ 24-25.) Afterward, Precision sent a technician to attempt to resolve the issue. (*Id.* ¶¶ 26-28.)

In February 2020, after Precision's repair attempts proved unsuccessful, Precision provided a replacement version of the Equipment. (*Id.* ¶¶ 28-29.) However, "[t]he new Equipment [only] ran for five days then became inoperable again." (*Id.* ¶ 30.) After two weeks of assessment, Precision was finally able to identify and resolve the issue. (*Id.* ¶ 31.)

II.  Procedural History

In June 2020, this litigation was commenced by ELS, which filed a complaint in Maricopa County Superior Court against O-Factor under the theory that O-Factor failed to make required lease payments under the parties' contract. (Doc. 1-1 at 1-5.) O-Factor thereafter filed a counterclaim and third-party claim that brought Precision into the action. (*Id.* at 69-81.) In February 2021, O-Factor and ELS agreed to dismiss their claims against each other. (*Id.* at 266-67.)

On March 16, 2021, Precision removed the action to this Court. (Doc. 1.)

On May 12, 2021, O-Factor filed its operative pleading, the First Amended Complaint ("FAC"). (Doc. 16.) This pleading added PX2 as a defendant. (*Id.*)

On May 27, 2021, Precision filed its answer. (Doc. 23.)

On July 14, 2021, PX2 filed its answer along with a counterclaim against O-Factor. (Doc. 33.)

On August 16, 2021, O-Factor answered PX2's counterclaim. (Doc. 36.)

On August 20, 2021, Defendants moved for judgment on the pleadings. (Doc. 37.)[1]

---

[1]   Defendants requested oral argument, but this request is denied because the issues are fully briefed and argument would not aid the decision process. *See* LRCiv 7.2(f).

- 3 -

On September 17, 2021, O-Factor responded.  (Doc. 42.)

On September 24, 2021, Defendants replied.  (Doc. 44.)

**DISCUSSION**

I.  <u>Legal Standard</u>

A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a Rule 12(b)(6) motion to dismiss.  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011).  Therefore, a Rule 12(c) motion "is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law."  *Fajardo v. County of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999).  "For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

II.  <u>Analysis</u>

The FAC asserts two claims for relief against each Defendant: (1) "Negligence (Product Liability)" (Counts One and Three); and (2) "Breach of Implied Warranty of Merchantability" (Counts Two and Four).  (Doc. 16 ¶¶ 43-76.)

A.  **"Negligence (Product Liability)"**

i.  <u>The Parties' Arguments</u>

Defendants contend that, to the extent Counts One and Three are strict product liability claims, they fail as matter of law under *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 198 (Ariz. 1984), because O-Factor's "alleged injury was not the result of an inherently dangerous or hazardous product that caused an accident resulting in personal injury or damage" and instead arises from "an alleged failure of the product to perform as expected."  (Doc. 37 at 8-9.)  Alternatively, Defendants argue that, to the extent Counts One and Three are negligence claims, they fail as a matter of law because Defendants' sole "duty [was] to refrain from unleashing inherently dangerous or hazardous products in the market" and they otherwise owed no

duty to O-Factor. (*Id.*)

In response, O-Factor does not respond to Defendants' arguments regarding negligence and limits its discussion to the law of "Strict Liability." (Doc. 42 at 2-5.) On that issue, O-Factor suggests that Defendants are seeking dismissal of Counts One and Three pursuant to the economic loss rule ("ELR") and argues that the ELR is inapplicable because, as recognized in *Sullivan v. Pulte Home Corp.*, 306 P.3d 1 (Ariz. 2013), it only prohibits recovery of economic losses between contracting parties, whereas here there was no contract between the parties. (*Id.* at 2.) O-Factor further contends that *Salt River* is inapplicable because it is "a partially abrogated case from approximately forty years ago" that "merely provides a paradigm to analyze if tort or contract law is appropriate by way of a three-part test" and does not hold that "an accident is . . . a requirement to impose tort liability on manufacturers." (*Id.* at 2-4.) Finally, and alternatively, O-Factor argues that Counts One and Three should survive even under Defendants' interpretation of *Salt River* because (1) the Equipment was used to produce CBD consumables and therefore posed an unreasonable risk of harm, as a malfunction could have created a defect that would pose a health risk to consumers; and/or (2) the economic harm caused by the Equipment qualifies as an unreasonable risk of harm because it "endager[ed] the business." (*Id.* at 4-5.)

In reply, Defendants reiterate that O-Factor "does not allege it was exposed to an unreasonable risk of injury" and argue that the theory that consumers could have been injured by CBD products made with the Equipment is not in the pleadings and "entirely speculative." (Doc. 44 at 2-4.) Defendants also argue that all of the *Salt River* factors "weigh against imposing tort liability." (*Id.* at 4-5.) As for the ELR, Defendants contend it is a red herring because their dismissal arguments turn on the lack of duty and Arizona law does not create a duty to "to exercise reasonable care for the purely economic well-being of others." (*Id.* at 5-7.)

 ii. <u>Analysis</u>

The Court agrees with Defendants that Counts One and Three fail as a matter of law. As an initial matter, although those counts are denominated as "Negligence (Product

Liability)" claims in the FAC, O-Factor characterizes them as "Strict Liability" claims in its response to Defendants' motion and makes no attempt to respond to Defendants' argument that, to the extent they are intended to be negligence claims, they fail as a matter of law. O-Factor has thus abandoned any argument that Counts One and Three state valid claims for relief under Arizona's law of negligence.

As for whether Counts One and Three state valid claims under Arizona's law of strict liability, the decision in *Salt River* provides guidance. There, the plaintiff—an electric utility company—asserted a strict liability claim after a gas turbine generator manufactured by the defendant exploded due to an alleged design defect. *Id.* at 202-05. Among other things, the explosion caused the plaintiff to suffer $1.9 million in property damage (because the explosion "destroyed" some of the plaintiff's turbine blades) and "$50,000 in lost profits and expenses." *Id.* at 210.

When analyzing whether to allow the plaintiff's strict liability claim to proceed, the *Salt River* court considered the following "hypothetical"—a plaintiff purchases a product, the product malfunctions for "twenty-four hours," and the plaintiff suffers economic losses resulting from "lost . . . profits anticipated from . . . sales to . . . consumers." *Id.* at 208 (hypothetical at "Plant #5"). Although the court acknowledged that, under "[t]he majority rule," such a claim would be categorically barred because pure "economic losses such as those [in the hypothetical] are not recoverable in tort," the court declined to "adopt[] the majority rule as a blanket disallowance of tort recovery for economic losses" and instead stated that "the better rule is one which examines the loss in light of the nature of the defect that caused it, the manner in which it occurred, and the nature of any other contemporaneous losses." *Id.* at 209. The court elaborated: "Where economic loss, in the form of repair costs, diminished value, or lost profits, is the plaintiff's only loss, the policies of the law generally will be best served by leaving the parties to their commercial remedies. Where economic loss is accompanied by physical damage to person or other property, however, the parties' interests generally will be realized best by the imposition of strict tort liability." *Id.* Applying these standards, as well as other standards developed in other

portions of the opinion, the court concluded that the plaintiff should be allowed to pursue a strict liability tort claim for $50,000 in lost-profit damages against the manufacturer because, *inter alia*, the plaintiff's "major claim [was] for damage to its turbines incurred in an accident" that involved "'an explosion and fire'" and "the accident was of a type which could endanger persons and 'other property.'" *Id.* at 210-11.

This case is dissimilar in key respects from *Salt River* and instead mirrors the hypothetical scenario in *Salt River*. O-Factor is seeking purely economic damages arising from the temporary malfunction of the Equipment. The malfunction did not result in an any sort of accident, let alone an explosive accident, and did not cause physical damage to a person or other property. *Salt River* strongly suggests that a strict liability tort claim will not lie in this circumstance: "Where economic loss, in the form of repair costs, diminished value, or lost profits, is the plaintiff's only loss, the policies of the law generally will be best served by leaving the parties to their commercial remedies." *Id.* at 209.

Other portions of *Salt River* further support the conclusion that Counts One and Three are not valid strict liability claims under Arizona law. Among other things, *Salt River* states that the "distinction between the tort and [contract] formulations" turns in part "on the hazardous or non-hazardous nature of the defective product at issue." *Id.* at 207. *Cf. Brethauer v. General Motors Corp.*, 211 P.3d 1176, 1182 (Ariz. Ct. App. 2009) ("A manufacturer is strictly liable for injuries caused by use of a product in a defective condition and unreasonably dangerous."). Here, the FAC does not plausibly allege that the Equipment was hazardous and unreasonably dangerous. Instead, it merely alleges that the Equipment was inoperable. To be sure, the FAC contains a conclusory assertion that the Equipment had "defects that were unreasonably dangerous" (Doc. 16 ¶¶ 17, 24-31, 46, 64), but inoperable machinery is not necessarily dangerous and the FAC does not allege facts explaining how or why the inoperable state of the Equipment rendered it dangerous. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) ("[C]onclusory statements in a complaint and 'formulaic recitation[s] of the elements of a cause of action' are not sufficient.") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007))).

As for O-Factor's contention that the Equipment posed an unreasonable risk of harm because it could have produced defective consumables (Doc. 42 at 4), this contention does not appear anywhere in the FAC. *Fajardo*, 179 F.3d at 699 (only the pleadings are considered when evaluating a motion for judgment on the pleadings). This contention is also difficult to reconcile with the factual allegations that *do* appear in the FAC, which suggest that Kofarm rescinded its contract with O-Factor before the Equipment was first restored to an operational state. (Doc. 16 ¶¶ 20-21, 30.) Inoperable equipment cannot create any kind of product, let alone a dangerous product. At any rate, the FAC does not allege that the malfunctioning equipment created a dangerous product and does not remark on the quality of any product created during the Equipment's intermittent five days of operability (or if any product was in fact created).

Finally, as Defendants correctly point out in their reply, O-Factor's inability to pursue a strict liability claim for economic damages has nothing to do with the ELR—it is a function of the limitations imposed by Arizona's substantive law of strict liability. *Sullivan* is not to the contrary. 306 P.3d at 4 (acknowledging that a "holding that the economic loss doctrine does not bar [certain] tort claims does not, of course, imply that those claims will ultimately succeed" and noting that other Arizona decisions "direct[] courts to consider applicable substantive law to determine if non-contracting parties may recover economic losses in tort") (citation omitted).

### B. **Implied Warranty Of Merchantability**

#### 1. The Parties' Arguments

Defendants seek dismissal of Counts Two and Four on the ground that economic damages are only available pursuant to a claim for breach of the implied warranty of merchantability if there is privity of contract between the parties, which is lacking here. (Doc. 37 at 10-11.) Defendants continue: "[T]he only party responsible for Plaintiff's lost profits is ELS since only ELS had knowledge of the Kofarm contract and Plaintiff's specific needs at the time the Lease Agreement was executed." (*Id.* at 11.)

In response, O-Factor contends that the contractual-privity requirement only applies

to implied-warranty claims under the UCC and does not apply here because Counts Two and Four sound in tort. (Doc. 42 at 5.) O-Factor asserts that because the Equipment "failed to be inoperable [sic]" and "was unfit for its ordinary purpose," Defendants breached the implied warranty of merchantability. (*Id.* at 7.)

In reply, Defendants assert that "Arizona merged the implied warranty in tort law into products liability law decades ago," and "[b]ecause [O-Factor's] products liability claims fail, so must [its] warranty claims." (Doc. 42 at 7-8.)

2. Analysis

Defendants have the better of these arguments. Under Arizona law, a claim for economic loss arising from an alleged breach of the implied warranty of merchantability requires privity of contract between the parties. *Flory v. Silvercrest Indus.*, 633 P.2d 383, 388 (Ariz. 1981) ("There has been disagreement among courts in other jurisdictions as to the propriety of awarding economic damages under the theory of implied warranty to plaintiffs who are not in privity with defendant manufacturers. Some courts require privity before awarding such damages. Others do not. We agree with the cases . . . which hold that economic losses are not recoverable for breach of implied warranty in the absence of privity of contract.") (citations omitted). It is undisputed that privity of contract is lacking here.

Nor may O-Factor evade the rule announced in *Flory* by claiming that the rule only applies to implied-warranty claims under the UCC, whereas it is asserting a tort-based implied-warranty claim. This distinction is illusory. *Scheller v. Wilson Certified Foods, Inc.*, 559 P.2d 1074, 1076 (Ariz. Ct. App. 1976) ("Although the complaint was framed to impose liability under theories of both breach of warranty and strict liability in tort, on this appeal the plaintiff recognizes that where no express warranty was made to him, his claim must rest on implied warranty. . . . [T]he theory of liability under implied warranty has been merged into the doctrine of strict liability in tort, so that it is on this latter doctrine that the plaintiff's claim must stand or fall."). Moreover, to the extent Counts Two and Four are considered strict liability tort claims, they fail for the reasons discussed in Part

II.A above—the facts alleged in the FAC are insufficient to state a valid strict liability claim under Arizona law.

### C. Leave To Amend

In their motion for judgment on the pleadings, Defendants specifically argue that any request for leave to amend should be denied because amendment would be futile. (Doc. 37 at 12.) O-Factor does not suggest otherwise in its response—it does not request leave to amend in the event Defendants' motion is granted and does not identify any new facts it might be able to allege to cure the defects identified by Defendants. The Court construes this as a concession that leave to amend should be denied on futility grounds.

At any rate, even if O-Factor had requested leave to amend, such a request would be denied. Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the Court "should freely give leave [to amend] when justice so requires." The Ninth Circuit has emphasized that "[t]his policy is 'to be applied with extreme liberality.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). "An amendment is futile when 'no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (citation omitted). Here, for the reasons identified by Defendants, granting O-Factor leave to file another amended complaint would be futile. *Cf. Chodos v. W. Publishing Co.*, 292 F.3d 992, 1002 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is 'particularly broad.' ") (citation omitted).

…

…

…

…

Accordingly,

**IT IS ORDERED** that Defendants' motion for judgment on the pleadings (Doc. 37) is **granted**.

Dated this 25th day of February, 2022.

Dominic W. Lanza
United States District Judge